LUGNER, by guardian *ad litem,* Respondent, vs. MILWAUKEE ELECTRIC RAILWAY & LIGHT COMPANY, Appellant.

*April 6—May 2, 1911.*

*Street railways: Who are passengers: Wrongful ejection by conductor: Scope of his employment: Liability: Special verdict: Changing answer: Negative pregnant.*

1. To entitle one to the rights of a passenger on a street car it is not necessary that he shall have paid his fare or even entered the car.

2. A boy who boarded a street car prepared and willing to pay his fare in case he could not ride free was not deprived of his character as a passenger by the fact that he asked for a free ride. It is the refusal to pay upon proper demand, or the entry upon the car with intent not to pay, which has that effect.

3. If a street car conductor wrongfully ejects a person who has already paid or is ready to pay his fare because he thinks such

passenger has not paid or on demand will not pay, it is a wrongful act within the scope of his employment, for which his principal is liable to respond.

4. Where the jury by special verdict found that defendant's conductor committed an assault on the plaintiff while he was upon or leaving the car, but also found that at the time of such assault the conductor was not acting within the scope of his employment, the court properly changed the latter finding, since the assault, if committed at all, was confessedly committed while ejecting plaintiff for nonpayment of fare.

5. A finding in a special verdict that the conductor of a street car did not "*wilfully*" strike at plaintiff from the rear window of the car *with the intention of injuring him by violence*," is a negative pregnant, and does not negative the making of a hostile motion by the conductor out of the rear window.

6. Where a boy was wrongfully driven from a street car and frightened by the conductor, and, fearing pursuit, ran around the rear of the car, whereupon the conductor thrust his head and shoulders out of the rear window to see, as he testified, that the boy was not hanging to the car, and the boy, thinking the conductor was trying to grab him, was thereby still more frightened, so that he jumped against and was knocked down by a car passing in the opposite direction, all such acts of the conductor were part of the wrongful ejection of the boy from the car, for the proximate consequences of which the street car company was liable.

APPEAL from a judgment of the circuit court for Milwaukee county: W. J. TURNER, Circuit Judge. *Affirmed.*

The defendant operates a street railway system in Milwaukee, and this action is brought by the plaintiff for personal injuries resulting, as is alleged, from an assault and improper ejection from one of the defendant's cars by the conductor on the evening of January 10, 1908. The plaintiff, a boy fifteen years and four months of age, had been skating with several boy companions on the evening in question at a park in the western part of the city some distance from his home, and returned homeward, reaching the corner of Clybourn and Thirty-fifth streets at about 9:30 o'clock. The Clybourn street line of the defendant's railway ends here, and a car had just arrived at the terminus and was standing on

the north track, preparing to start eastward, as the boys arrived at the corner. The plaintiff and one of his companions, named Guy Raymond, fourteen years of age, started for the car as it was standing still, intending to get a free ride if possible. The conductor had just opened the vestibule doors on the south side and swung the trolley around and at this time was just about starting the car eastward. At this point the accounts of the transaction differ as to what followed. The plaintiff testifies that Guy asked for a free ride to Twenty-seventh street just before they got on the car; that the conductor said nothing in reply to the question, and they got on the rear platform and repeated their request when the conductor was near the stove in the middle of the car, and that he turned and ran towards them with his hands up above his head, and said, "Get off or I will kick you off;" that they immediately started and jumped off, and as they were doing so the conductor, who was then on the back platform, kicked at them; that he and Guy both jumped, facing eastward, each having hold of one of the brass handholds, and ran along two or three steps with the car; that by that time the car had passed over the switch from the north to the south track and was about at the crossing of Thirty-fourth street; that Guy ran off to the south and he (plaintiff) thought perhaps the conductor was coming off the car, and he ran around the rear of the car to the north, and as he was passing the rear trolley window the conductor reached out of the window and grabbed at him, and he gave a jump to the north and jumped right into a west-bound car just passing on the north track and was knocked down and run over, and received injuries necessitating the amputation of one foot and seriously impairing the other. He further testified that when the conductor rushed at them and raised his foot it frightened him and he didn't know what he was doing, and when the conductor grabbed at him from the trolley window it frightened him still more; that he had a nickel and two car tickets in his pockets at the time and

was ready to pay his fare if he could not get a free ride. Guy Raymond corroborated the plaintiff's version of the transaction, while two other boys of the party, Ivo Lanning and Lewis Stearns, who stood on the sidewalk and watched to see whether *Harry* and Ben would get a ride, also gave testimony substantially corroborating plaintiff's story, so far as they were able to see the transaction. The conductor testifies that when the boys asked if they could have a ride he said yes, if they had any money, and they said they didn't, and he said they couldn't ride free, and told them to get off the car, and they got off, but came back on the step; that this was before the car started, and he told them to get off again because he was going to start the car, and that they got off and he started the car; that the two boys had hold of the handholds and ran along with the car until the car got across the switch; that he told them to let go and then they ran away, one going south to the sidewalk and the other north around the back end of the car, and he thought perhaps the boy was hanging on to the car on the north side, so he leaned out of the rear trolley window, but didn't see the boy, and then the west-bound car came along and the accident happened, and he at once stopped his car. The conductor absolutely denied rushing at the boys or kicking at them or grabbing at the plaintiff, and denied that he threatened to kick them off.

The jury returned the following special verdict:

"(1) Was *Harry Lugner,* the plaintiff, injured by coming in contact with and being knocked down and run over by a west-bound car of the defendant at or near the west crossing of Thirty-fourth and Clybourn streets, in the city of Milwaukee, on January 10, 1908? *A.* (by the court). 'Yes.'

"(2) Did the plaintiff, *Harry Lugner,* board the defendant's east-bound car No. 342 at Thirty-fifth street on which Arthur Miller was conductor? *A.* (by the court, with consent of counsel). Yes.

"(3) Was the relation of passenger and carrier existing between the plaintiff and the defendant at the time plaintiff was on defendant's east-bound car, just before he was injured? *A.* Yes.

"(4) Did the conductor, Arthur F. Miller, assault said plaintiff while upon or leaving the said car? *A.* Yes.

"(5) If you answer question No. 4 'Yes,' was the conductor at the time of such assault acting within the scope of his employment? *A.* No.

"(6) If you answer question No. 4 'Yes,' were the injuries of the plaintiff proximately caused by such assault? *A.* Yes.

"(7) Did the conductor wilfully strike at the plaintiff from the rear window of the car with the intention of doing bodily injury to the plaintiff by violence? *A.* No.

"(8) If you answer the seventh question 'Yes,' then answer this question: Was the plaintiff within striking distance at the time the conductor made a motion towards him through the rear car window, if you find such motion was made? *A.* No.

"(9) If you answer the seventh question 'Yes,' then was the conductor acting within the scope of his employment in making a motion at the plaintiff through the rear car window? *A.* No.

"(10) Did the defendant's conductor eject the plaintiff from the car No. 342 in an improper manner? *A.* Yes.

"(11) If you answer question No. 10 'Yes,' were the plaintiff's injuries proximately caused by such improper ejection from the car? *A.* Yes.

"(12) What sum will compensate the plaintiff for the injuries he sustained? *A.* 5,000 dollars."

Motions by the defendant to change the answers to questions 3, 4, 6, 10, and 11 of the verdict from "Yes" to "No," and for judgment on the verdict as so amended, and for judgment notwithstanding the verdict, were successively overruled, and the court changed the answer to the fifth question from "No" to "Yes," and entered judgment for the plaintiff upon the verdict as so amended. From this judgment the defendant appeals.

For the appellant there was a brief by *Van Dyke, Rosecrantz, Shaw & Van Dyke,* and oral argument by *Clarke M. Rosecrantz.* On the question of proximate cause they cited 1 Sutherland, Damages (3d ed.) § 34; *Glenesky v. Kimberly & C. Co.* 140 Wis. 52; *Hasbrouck v. Armour & Co.* 139

Wis. 357.    As to the railway company's liability for the act of the conductor: *Bergman v. Hendrickson,* 106 Wis. 434; *Haehl v. Wabash R. Co.* 119 Mo. 325; *Mogk v. Chicago City R. Co.* 80 Ill. App. 411; *Rowell v. Boston & M. R. Co.* 68 N. H. 358; *Farley v. C., H. & D. R. Co.* 108 Fed. 14; *Finley v. Hudson E. R. Co.* 64 Hun, 373; *Kiernan v. New Jersey Ice Co.* 74 N. J. Law, 175; *Hoar v. Maine Cent. R. Co.* 70 Me. 65; *Keating v. Mich. Cent. R. Co.* 97 Mich. 154; *Smith v. L., E. & St. L. R. Co.* 124 Ind. 394; *Indianapolis St. R. Co. v. Hockett,* 161 Ind. 196.

For the respondent there was a brief by *Christian Doerfler* and *Glicksman, Gold & Corrigan,* and oral argument by *Mr. Doerfler* and *Mr. W. L. Gold.*    To the point that the defendant was liable for all the natural and proximate consequences of the assault, they cited *Vosburg v. Putney,* 80 Wis. 523; *Brown v. C., M. & St. P. R. Co.* 54 Wis. 342; *Kline v. Cent. Pac. R. Co.* 39 Cal. 587; *McCann v. Sixth Ave. R. Co.* 117 N. Y. 505; *Ansteth v. Buffalo R. Co.* 9 Misc. 419, 30 N. Y. Supp. 197.    The conductor was acting within the scope of his employment: *Fick v. C. & N. W. R. Co.* 68 Wis. 469; *Daley v. C. & N. W. R. Co.* 145 Wis. 249.

Winslow, C. J.    There was sufficient evidence to justify the finding that the plaintiff was a passenger on the street car at the time of his ejection.    One does not need to have paid his fare or even to have entered the car to have become entitled to the rights of a passenger.    If he has entered the station with the good-faith intent to take passage and ability to pay his fare, he becomes to all intents and purposes a passenger.    *Karr v. Milwaukee L., H. & T. Co.* 132 Wis. 662, 113 N. W. 62.    If, as the plaintiff testifies, he was prepared and willing to pay his fare in case he could not ride free, the fact that he asked for a free ride does not deprive him of his character as a passenger.    It is the refusal to pay on proper demand or the entry upon the car with intent not to pay which has this effect.

The court was unquestionably right in changing the answer to the fifth question from "No" to "Yes." If, as the jury found, there was an assault committed by the conductor, it was confessedly committed while he was ejecting the plaintiff from the car for nonpayment of fare. It is the conductor's duty to eject persons who refuse to pay fare, and if he wrongfully ejects a person who has already paid or is ready to pay his fare, because, as he thinks, such passenger has not paid or will not pay his fare on demand, it is a wrongful act within the scope of his employment for which his principal is liable to respond. The fact that the act is wrongful does not of itself take it without the scope of his employment. His duty is to see to it that passengers pay their fare and to properly eject them if they do not. Of course his master does not authorize him to commit a tort in performing that duty, but if in his endeavor to carry out that duty he ejects the wrong person or commits a tort such as was found to have been committed here, it is a tort within the scope of his employment, though not authorized by his master. *Johnston v. C., St. P., M. & O. R. Co.* 130 Wis. 492, 110 N. W. 424.

The chief contention of the appellant is that the answer to the seventh question in connection with the evidence of the plaintiff himself acquits the defendant of liability. The plaintiff testified that as he went around the back end of the car to the north the conductor leaned out of the rear trolley window and grabbed at him with his hand, and it frightened him, "and I gave a jump, one jump, and jumped right into the other car."

The argument is that by this testimony the plaintiff has definitely fixed the proximate cause of his fright and the resulting collision with the west-bound car to be the grab or motion which he alleges that the conductor made at him out of the rear window of the car, and has thus eliminated from consideration the previous alleged assault and ejection from the car, and in fact everything which preceded the grab from the rear window. Such being the case, the defendant claims

that when the jury found in answer to the seventh question that the conductor did not strike at the plaintiff from the rear window they negatived the tortious act which by the plaintiff's own testimony was the sole proximate cause of his injury.    One difficulty with this contention is that the seventh question and answer taken together do not negative the making of a hostile motion by the conductor out of the rear window. It is a complete negative pregnant.    It finds that the conductor did not *wilfully* strike at the plaintiff *with the intention of injuring him by violence.*    It does not find that the conductor did not strike at the plaintiff at all, but by inference finds that he did make a striking motion out of the rear window but without wilful intent to injure the plaintiff thereby.    Bliss, Code Pleading, § 332.    Further, the conductor admits that he went to the rear window at this exact time and leaned his body out of it.    So it is a fact that the conductor appeared at the window; and, even admitting that the conductor made no motion with hostile intent, it seems certain nevertheless that the plaintiff saw him when he so appeared.

By the conductor's own statement his appearance at the window was simply the concluding act of his endeavor to successfully and finally prevent the boys from riding on the car.    The transaction was one continuous wrongful action from the time when, as the jury found, he started down the middle of the car towards the boys until he thrust his head and shoulders out of the rear window to see that neither of them was hanging on to the north side of the car.    There is really no place where a division line can be drawn.    All the conductor's acts, including the last, were a part of the improper ejection which the jury say by finding 11 proximately caused the plaintiff's injuries.    The improper ejection did not cease with the kick at the car step, but only when the conductor ceased in his exertions to prevent the boys from riding.

The plaintiff testified, and the testimony is not incredible, that he was so frightened when the conductor rushed at him

and raised his foot that he did not know what he was doing, and that when the conductor appeared at the rear window and attempted to grab him, as he thought, it frightened him still more, and he jumped into the side of the west-bound car.

These considerations are decisive of the case. The findings of the jury as changed by the court are sustained by sufficient evidence and necessitate judgment for the plaintiff.

*By the Court.*—Judgment affirmed.